# CHARLESTON.

### KNOPSNYDER *v.* QUINN.

Submitted March 2, 1910. Decided February 7, 1911.

1. PARTNERSHIP—*Bill for Accounting—Sufficiency.*

   The bill in this case, though questioned, held good technically on demurrer, as a bill by one partner against his co-partner for settlement of partnership accounts.

2. SAME—*Bill for Accounting—Evidence—Sufficiency.*

   A suit in which a partner fails in his proof to make out a case entitling him to an injunction enjoining his co-partners from prosecuting a suit at law brought to recover a balance alleged to be due him on a special contract of agency, and to involve the same in the settlement of alleged unsettled partnership accounts.

3. SAME—*Action Between Partners—Special Contract.*

   Where no adjustment of partnership accounts is necessary, to reach the merits of the case, one partner may sue his co-partner for a balance due him on a special contract. A proposition stated, but not necessarily involved, and not decided.

Appeal from Circuit Court, Randolph County.

68 W. Va.

. Bill by the Davis Trust Company, executor of J. W. Knopsnyder, against Samuel T. Spears, administrator of M. J. Quinn. Decree for complainant, and defendant appeals.

*Reversed, Injunction Dissolved, and Bill Dismissed.*

*S. T. Spears,* for appellant.

*W. B. Maxwell* and *E. A. Bowers,* for appellee.

MILLER, JUDGE:

The professed object of the bill is to settle an alleged unsettled partnership account, and incidentally to enjoin defendant from prosecuting a suit at law, brought by him against plaintiff. Quinn's suit against Knopsnyder is to recover $13,677.08⅓, balance claimed to be due him as his share of the profits on a sale of timber lands of Knopsnyder and Nydegger, pursuant to a special contract with him individually, of August 11, 1906. A preliminary injunction was awarded on the filing of the bill, but shortly afterwards, and before answer filed, both Knopsnyder and Quinn died, and the suit was revived in the names of their respective administrators, and prosecuted and defended by them to the final decree appealed from, pronounced November 23, 1908, perpetuating the injunction and referring the cause to a commissioner to settle the alleged unsettled accounts of the partnership.

The partnership agreement, dated October 1, 1905, in writing, is as follows: "We the undersigned do enter into a partnership, and agree to do a commission business: We further agree that we shall get a license which will allow us to buy and sell land according to law, and also sell lands on commission. But the purpose of this writing is to do a commission business, and anything either one of us may sell in commission, we do agree to divide the profits with the other. We also agree to solicit business in the name of Knopsnyder and Quinn. All legitimate expenses is to be paid by which ever party transacts the business, and deducted from the profits of the sale, and the remainder of all money equally divided. This contract is not to interfere with either of us making individual purchases, either party has the right to buy out-right any thing he may choose, and sell the same for his own profits. In case there should be any partnership money in either ones hands, and anything should happen,

in case of death or accident, this money is to be turned over to the legal representatives of the deceased without any defalcation. This contract is to remain in force until mutually agreed by both parties that it shall be dissolved, or otherwise dissolved by legal course of law."

The contract of Knopsnyder and Nydegger with Quinn was the second one made between them. The first gave Quinn sixty days within which to sell the lands at not less than $45,000.00; if he did not sell for more he was to have five per cent. commissions; if he sold for more, he was to have as his own all that he got for the lands above the minimum price. Before this contract had expired Quinn felt confident of his ability to finally sell these lands at a price far above the limit of his contract, but was doubtful whether he would be able to consummate the sale within the time given him; he had priced the lands as high as $110,000.00 to $115,000.00, and had a good prospect, he thought, of selling at not less than $100,000.00, and to make a profit for himself of $55,000.00. He advised Knopsnyder and Nydegger of his prospects and situation, and asked for an extention of time, telling them if additional time was not given him he had arranged to take the property at the price stipulated, and take chances of selling at a profit.

Being so advised, Knopsnyder, who appears to have been at least a very thrifty man, if not over-zealous of his own interests, represented to Quinn that his and Nydegger's wives, who had not signed the contract, would not join in a deed to Quinn at the price of $45,000.00, the representation of a fact, which so far as Nydegger's wife was concerned, the evidence shows was not true. But Quinn was thereby induced to and did a few days before the first expired enter into the second contract of August 11, 1906, which, after referring to the acreage, location and source of title to the lands, provides: "Now it is understood that whereas Nydegger and Knopsnyder has bought this property, has invested in it the sum of fifteen thousand dollars for the purchase money and other expenses, and has heretofore made a contract with the said M. J. Quinn, which this contract is to take the place of, and disannul the other contract, the same as if it had never been made, and in consideration of these changes the parties of the first part are now putting the aforesaid property into the hands of M. J. Quinn to sell, and it is further under-

stood that the parties of the first part are to retain $15,000 of the money that the property sells for, as purchase money and other expenses, and after retaining the fifteen thousand dollars, M. J. Quinn is to have one third of all profits over and above the fifteen thousand dollars. And said M. J. Quinn is to pay one-third of all expenses in the way of getting right-of-way, looking up titles or any other expenses connected with the sale of the property, other than those expenses connected with the showing of the property, which are to be borne by the said Quinn individually. And it is further understood and agreed that the said Quinn is not to sell the property for less than $60,000 but has the privilege of selling it for as much more as he can, and is to have one-third of the profits over and above the $15,000. It is further understood and agreed that M. J. Quinn is to have ninety days from this date in which to make the sale under the terms of this contract."

Soon after entering into this new contract Quinn succeeded in negotiating a sale of the lands to the Wyoming Lumber Company, at the price of $100,000.00; and on October 13, 1906, the sale and transfer was fully and finally concluded by the making, execution and delivery by Knopsnyder and Nydegger, their wives joining therein, of a deed to the purchaser, the latter paying down in cash $33,300.00; and for the balance, $67,700.00, it executed its several notes, secured by a vendor's lien reserved in the deed as follows: Three to Nydegger, one payable on or before January 1, 1907, for $5,666.66; two for $8,333.34, each, payable on or before October 4, 1907, and on or before October 4, 1908, respectively, aggregating $22,333.34; six to Knopsnyder, two payable on or before January 1, 1907, for $5,666.67, each; two on or before October 4, 1907, for $8,333.33, each, and two on or before October 4, 1908, each for the like sums of $8,333.33, and aggregating $44,666.66.

A significant fact to be observed in connection with the making of these notes is that those given Knopsnyder were made in pairs, each pair falling due at the same time, and corresponding as to time and amount to the single notes given Nydegger. The evidence of Nydegger and others, uncontradicted, present at the time, is, that when the parties came to closing up the transaction, making the notes and deed, the question arose, how should the interest of Quinn in the purchase money be disposed of. No

one then questioned his right to share in this purchase money,
according to the terms of his contract. He was not immediately
present, was nearby, however, and knew the transaction was
being closed up between the immediate parties. Knopsnyder
did not then make any claim to share with Quinn in the latter's
share of the profits. Nydegger in his evidence, explaining how
the notes were made as they were, says, in substance, that when
they came to that point, as Quinn's name did not appear in the
deed Mr. Herbert raised the question whether it would be well
to have his third of the notes made payable to him, and the
matter was talked over and someone, probably Mr. Hoover, sug-
gested that they make one third of the notes payable to Nydegger,
one third to Knopsnyder, and the remaining third to Knopsnyder
and Nydegger jointly to represent Quinn's share, the latter
notes to be endorsed by them over to Quinn. Whereupon Knop-
snyder got up, and announced that he would go and see Quinn
and find out how it would suit him to have the notes made, that
he went out and was gone probably fifteen or twenty minutes,
or a half hour, and on returning said he had seen Quinn, and
had arranged with him to have two thirds of the notes made
to himself as they were made and secured in the deed. Nydegger
also says that when Knopsnyder returned from seeing Quinn,
he said something about cashing some of the notes for Quinn.
Hoover, a witness for defendant, fully corroborates Nydegger
as to these facts. Edmonds, another witness, a son-in-law of
Quinn, present when Knopsnyder came to see Quinn, and as
showing how Quinn's share of the purchase money notes came to
be made payable to Knopsnyder, in substance, says, that Knop-
snyder, when he came in, addressing Quinn, said, "within the
next ten days" we will have "to take up that proposition down
in North Carolina, and  *   *   *   you will need every cent you
can get, and will need it in ready money to buy the Leather
Company off," remarking that it would take $50,000.00 or
$52,000.00, the witness did not remember which, but said, "I
want to make a proposition, you have these *deeds* (notes) made
over to me of the Wyoming Lumber Company, and  *   *   *   I
can raise the cash on $20,000.00 between the two banks, the
Trust Company here and the bank at Hendricks, and I will
not have to give my individual notes for more than $8,000.00";
that he also told Quinn at the same time that his share of the

profits' was $28,333.00. So much in explanation as to why Quinn's share of the notes were made payable to Knopsnyder.

Quinn's suit, enjoined by the decree appealed ·from, was to recover of Knopsnyder the balance alleged to be due him from Knopsnyder on this transaction.

While the bill is predicated on the theory of dissolution, and the right to a settlement of the alleged partnership accounts, the evident and only real purpose of it was to enjoin the suit at law, and on the pretense of an unsettled partnership accounts to, if possible, involve the sale of Knopsnyder and Nydegger lands in a general partnership settlement. This purpose we think is disclosed by the character of the allegations. It is alleged that after entering into the partnership considerable business was done, and large profits earned, some of 'which alleged "partnership transactions", it is alleged, "were fully settled between the parties, to their mutual agreement and satisfaction", but that a number have not been settled. None are specified. It is also alleged that defendant may have received a large amount of commissions not accounted for, and that he is likely to receive a large amount in which plaintiff would justly and legally be entitled to participate, but which defendant is attempting to fraudulently prevent, and to himself retain the whole thereof. The only attempt at specification of this charge is that notice of a dissolution of the partnership had been served on plaintiff by Quinn, which is exhibited 'with the bill, and that at the time of such notice Quinn had been negotiating a sale of the Wyoming Lumber Company's property, and that the negotiations had so far advanced that it had become reasonably certain the property would be sold, and Quinn realize a profit of $11,500.00, and that in prospect thereof Quinn had given notice of such dissolution to fraudulently deprive plaintiff from participating therein. The notice on its face, dated September 9, 1907, said, however, that it was given because of the strained and unfriendly relations existing between the parties growing out of legal difficulties resulting in a pending suit, making it impossible for the partnership business to be continued with success, because of lack of mutual confidence, and because Knopsnyder had not, during the continuance of the partnership, contributed anything of material value to the success of the partnership.

The only unsettled matters which plaintiff specified in his bill, and on account of which he pretends there would be anything due him on such settlement are: Attorneys fees paid Talbott and Hoover in November, 1906, $62.50; expenses, trip to Philadelphia, January, 1907, to secure option on Dry Fork Lumber Company property, $50.00; expenses, Asheville, N. C. to Philadelphia, $50.00; paid F. O. Blue in suit of Miller v. Wyoming Lumber Co., $50.00, and that it is probable that he has incurred other expenses not recalled by him, half of which would be chargeable to defendant.

With respect to the contract of August 11, 1906, and the sale by Quinn thereunder, though it is admitted that in making this contract plaintiff and Nydegger desired to avail themselves of the services of Quinn, and agreed to give him one third of the profits realized above the original cost, if he should make sale within ninety days at not less than $60,000.00, it is nevertheless charged, in contradiction thereof, that in entering into said contract both plaintiff and defendant fully understood that if the latter should make sale of the land as authorized by the agreement, one third of the profits realized by defendant would be partnership profits, to be divided equally between them. There is also an averment that without Knopsnyder's assistance in getting rights of way Quinn would have been powerless to close the sale, and realize the profits. But Quinn was not limited to one prospective purchaser; he evidently had more than one prospective purchaser; moreover, the contract contemplated that rights of way would have to be procured, and who would naturally be called upon to procure them? Would this naturally fall upon the agent or his principals? All that the contract says about the subject is that Quinn was to pay one third of all the expenses of procuring such rights of way, but the contract imposed on him no duty in relation thereto, except to pay one third of the cost. Nydegger testifies that it was his understanding that he and Knopsnyder were to help get the rights of way, so that Knopsnyder's help in procuring the rights of way from the Dry Fork Lumber Company, should count nothing against the rights of Quinn under his contract. Besides in the memorandum contract of sale made by Nydegger in Philadelphia, October 4, 1906, after having arranged for these rights of way, reference is made to the "contract made with M. J. Quinn on or about September 4,

1906," thereby giving credit for making the sale to Quinn and not to Knopsnyder.

But as more particularly bearing on plaintiff's right to enjoin the pending suit of Quinn, the bill further alleges that after Knopsnyder and Nydegger had received the cash payment, and taken the notes of the purchasers for the deferred payments, Knopsnyder and Quinn, had settled the transaction on the theory that Quinn had made the sale, and that Knopsnyder had received two thirds of the profits, that one third belonged wholly to the latter, and that the other third belonged to him and defendant as partners, and that he was entitled as partner to so participate in Quinn's share; and that a final settlement had been made between them on this basis, and that in that settlement Knopsnyder in consummation thereof had paid Quinn by check $4,000.00, and had given him three notes, one for $3,000.00, due on or before January 1, 1907, and two notes for $4,000.00 each, due respectively, on or before October 4, 1907, and on or before October 4, 1908, and that all of these notes had been paid by him, except the last, which Quinn, it is alleged, had hypothecated for a loan of $2,000.00. And it is finally averred that at the time of said settlement of their partnership interests in said sale, plaintiff and defendant also settled some other partnership matter, and also "settled a very considerable amount of money which said defendant had before that time borrowed of plaintiff, amounting to something like three or four hundred dollars." Although the theory of the bill is, an unsettled partnership account, it thus appears that plaintiff regarded this transaction as an independent transaction, and one fully settled between partners.

The bill also avers that a suit had been brought against the Wyoming Lumber Company, claimant of a part of the 800 acre tract included in said sale, and that if the claim should be established Knopsnyder and Nydegger would be liable to the lumber company on their covenant of warranty, and that Quinn would be liable to share any loss, and to refund to them a proportionate share of his profits on the sale. Quinn was not a party to their deed, however, and his contract binds him for no such loss.

Spears, administrator of Quinn, demurred to and answered the bill. Besides want of equity, the other grounds of demurrer

assigned were, in substance, that the theories of the bill are wholly inconsistent with the plain terms of the contract between Knopsnyder and Nydegger and Quinn; and that the alleged settlement with Quinn after the sale shows on its face that it could not have been final. The answer puts plaintiff upon proof of every material allegation of his bill. It substantially denies that there is any unsettled partnership account, and calls for full proof; denies that Quinn is in any way liable, for the alleged items of expenditures, as partner or under his contract of August 11, 1906. The answer admits settlement of the sale to the Wyoming Lumber Company, on the theory of profits stipulated in said contract, but denies any settlement of Quinn's share thereof on the basis of partnership profits as alleged, and denies all right of Knopsnyder to share therein as partner or otherwise; on the contrary, it charges that Knopsnyder was permitted to take Quinn's share in said profits, as shown, on condition that he would pay the same over to Quinn as Quinn needed the money, and that the check and notes of Knopsnyder given Quinn were on account, and not in settlement, and that Knopsnyder remains indebted to Quinn in the sum of $13,677.08, the balance sued for by Quinn, and that when Knopsnyder gave Quinn his notes as alleged it was understood that Quinn was to use them to raise money then needed, and not in full settlement for his share of the profits.

On the demurrer, it is questionable whether the averments are sufficient as a bill for settlement of a partnership account of this character; but on the whole we are disposed to say that it is technically sufficient, and that the demurrer was properly overruled. But see 1 Ency. Forms, 319, for a form of such bill; and 13 Ency. of Forms, 614 and note, on the requisites of such a bill.

On the merits of the case, however, we are of opinion that plaintiff has wholly failed to make a case, entitling him to any relief. There is absolutely no proof of any unsettled partnership transactions, unless we can except that pertaining to the sale of the Knopsnyder and Nydegger lands, which we will presently consider. There is no allegation or proof of partnership property for administration; no proof of debts due by or owing to the firm, and the plaintiff has not even offered evidence of the alleged payment or incurrence of the small items of expense

paid or incurred by him; so that outside of the one matter involved in the suit of Quinn against him which the decree enjoins, what need was there for a settlement, or for a reference to a commissioner for that purpose? Absolutely none.

Now as to the merits of the plaintiff's claim to a share in Quinn's profits in the sale of Knopsnyder and Nydegger lands. Excluding the evidence of Mrs. Knopsnyder, which is clearly incompetent, because of interest, and was rightly rejected by the court below, not a particle of evidence was offered even tending to show a final settlement between Knopsnyder and Quinn. The bare fact that on October 15, 1906, two days after the sale to the lumber company had been fully completed Knopsnyder gave Quinn his check and notes aggregating $15,000.00, is relied on to show a settlement. If we could consider Mrs. Knopsnyder's evidence, the plaintiff's case would be little improved; for while she says there was a final settlement, and that Knopsnyder was to have one half of Quinn's profits, she admits, on cross examination, that such was simply her understanding; she couldn't remember what either of the parties had said on the occasion. She produces and files with her evidence the $4,000.00 check, a check dated December 28, 1906, for $3,864.42, the $3,000.00 note of Knopsnyder and his $4,000.00 note due October 4, 1907. She fails to produce the third note, but says it was due January, but what year she does not say. She does say it was for $4,000.00, and that the check for $3,864.42 was in lieu of that note, and that it was paid by this check December 28, a few days before it became due, and she attempts to account for the difference between the amount of the note and check by saying that Quinn owed a small amount which was deducted. But this explanation does not explain the fact that neither of the $4,000.00 notes fell due January 1, 1907. The one she produces was not due until October 4, 1907, and the bill alleges that the other was not payable until October 4, 1908; the only note which was due January 1, 1907, was the $3000.00 note, which the check would have overpaid by over $800.00. More than this the bill, sworn to by plaintiff before his death, avers that at the time of his alleged settlement plaintiff and defendant settled some other partnership matters, not specified, and also settled a very considerable amount of money, which it is alleged Quinn had borrowed from Knopsnyder, amounting to something like three or

four hundred dollars, and this settlement Knopsnyder refers to the time he gave Quinn his check for $4,000.00. Now according to Knopsnyder's claim Quinn's share in that settlement was one half of $28,333.33⅓, or $14,166.66⅔, but he gave his checks and notes aggregating $15,000.00; and if he included in that settlement three or four hundred dollars borrowed money he added just that sum to the amount really paid Quinn. Moreover Quinn's full share of the cash payment, after deducting the $15,000.00, according to his contract, was $6,100.00; on the basis of plaintiff's claim to share in this' sum as partners Quinn's share would have been but $3,050.00, but Knopsnyder actually gave him his check for $4,000.00; so that if the check was intended as Quinn's share of the cash payment, it will not, on the theories of plaintiff, answer that purpose. Nor do the notes given Quinn, falling due, according to the bill, on the same dates as the deferred purchase money notes of the lumber company, represent the shares of Quinn in the notes given Knopsnyder. We think .these discrepancies can only be explained on the theory of defendant, that the check and these notes were given Quinn simply on account, and not in full settlement. Besides, the very terms of the contract of August 11, 1906 repels the theory of Knopsnyder, that he was to share with Quinn in his profits; and all the prior and concurrent circumstances negative this theory. The contract purports to be special; imposes certain individual liabilities on Quinn, and requires him to share with the other parties thereto certain expenses, ·and says that Quinn, not Knopsnyder and Quinn, "is to have one third of all the profits."

But great reliance is placed by plaintiff's counsel, on certain words of the partnership contract, namely, "anything that either one of us may sell in commission, we do agree to divide the profits with the other", and "either party has a right to buy outright anything he may choose, and sell the same for his own profits." Counsel would have us interpret these provisions as excluding Quinn from sharing with Knopsnyder in his profits, but as binding Quinn to divide with him his share, though Quinn was made his agent to sell the land from which those profits were derived. Unquestionably the partnership contract would have permitted either party to buy and sell out right and take all the profits; but it is reasonable to suppose that it

was contemplated that if either party should exercise his individual right to buy and sell and take all the profits, he could call for the service of the other, and because of the partnership contract share with him in his compensation. We do not think any such inequitable consequences were intended by the contract. Another significant provision of the contract of partnership is that it provided for doing the business in the name of the firm of Knopsnyder and Quinn. It was not done in this case. It is suggested that in omitting the name of the firm it may have been thought prudent to conceal from Nydegger the fact that the firm was concerned. We can see how such a motive might have moved Knopsnyder, but what reason could Quinn have had for doing so. What right had Knopsnyder to take greater profits than his partner Nydegger?

If, however, we should treat the sale by Quinn as a partnership transaction, it was made the subject of a special settlement, and no other unsettled business being shown, a court of law should not by injunction be ousted of its prior jurisdiction to try the rights of the parties to this special contract, and the finality of the alleged settlement under it. We emphasize the fact that the contract was special, treated by the parties as such, and the bill alleges it was the subject of special settlement. The position of plaintiff's counsel is that partnership settlements are cognizable only in courts of equity, but the general rule for which they contend is not without exception. *Newman* v. *Ruby,* 54 W. Va. 381, 386, relied on, recognizes this exception, by reference to numerous authorities on the subject, and holds that where no adjustment of partnership accounts is requisite to reach the merits of the case, a partner can as readily sue his co-partner in a court of law, as a stranger. But we need not decide this question, for in our opinion there is no partnership transaction here involved.

A lengthy argument is presented by plaintiff's counsel on the theory of long unexplained acquiescence in an account rendered; and on the theory of a settled account, and payments thereunder, and the *prima facie* effect thereof on the assailing party; and also on the theory that notes taken on such settlement are conclusive. But in our opinion no such questions are presented by the record. The evidence in our judgment falls far short of proving an account rendered, or an account settled, or the ac-

ceptance of notes in settlement thereof, concluding the defendant Quinn.

Our conclusion is that there is error in the decree below and that it should be reversed. We will therefore enter here such decree as we think the circuit court should have entered, dissolving the injunction and dismissing the bill, with the costs to the appellant incurred here and in the circuit court and we will so decree.

*Reversed, Injunction Dissolved, and Bill Dismissed.*